483 S.E.2d 835

**CITY OF WHEELING, Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Ohio County Public Service District, Appellees.**

**OHIO COUNTY PUBLIC SERVICE DISTRICT, Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and the City of Wheeling, Appellees.**

Nos. 23396, 23397.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 1997.

Decided Feb. 21, 1997.

---

Robert R. Rodecker, Charleston, for City of Wheeling.

John P. Bailey, Bailey, Riley, Buch & Harman, L.C. Wheeling, for Ohio County Public Service District.

Meyishi Blair, Charleston, for Public Service Commission.

PER CURIAM:

This opinion concerns two appeals of an order of the Public Service Commission of West Virginia concerning water rates and charges set by The City of Wheeling. Both The City of Wheeling ("Wheeling"), which adopted the ordinance establishing the rates, and the Ohio County Public Service District ("District"), which purchases water from Wheeling, seek review of the order. On appeal, Wheeling argues that the Public Service Commission of West Virginia ("Commis-

sion") lacked jurisdiction under *W.Va.Code,* 24–2–4b(c)(2) [1994] to consider the matter and erred in failing to hold a hearing on Wheeling's motion to dismiss for lack of jurisdiction. In its appeal, the District alleges that the Commission erred in applying a substantially invalid formula for determining the rate structure and in failing to provide the parties with sufficient notice of the application of the new formula. Because we find that the Commission had jurisdiction and did not err in applying a more specific formula, we affirm the decision of the Commission.

I.

*Facts and Background*

On May 2, 1995, Wheeling, by municipal ordinance, adopted higher water rates and charges for its municipally operated water utility. Wheeling sells its water to customers who reside inside and outside its municipal boundaries. Some of Wheeling's water is sold through resale customers, such as the District, to persons who reside outside the municipal boundaries. Typically, a resale customer purchases water from a supplier and, after adding its own costs of operation and debt service, sells the water to its customers. Wheeling's rate increase affected both groups of customers.

On June 5, 1995, the District and the Village of Bethlehem ("Bethlehem")[1], filed a petition with the Commission seeking review of the higher rates under *W.Va.Code,* 24–2–4b [1994]. The petition maintained that because the Wheeling rate ordinance was adopted without a class cost of service study to assure that all classes of customers were paying their fair share, the rate should be reviewed. Specifically, the petition alleged that increased rates were discriminatory: first, because the rates supported capital improvement projects that did not benefit the resale customers; and, second, because the rates imposed on the resale customers reflected a portion of the unaccounted for wa-

---

1. The District and Bethlehem are captive resale customers of Wheeling who, according to the Commission, have no other viable alternative for their water supply needs. Both are regulated utilities, which, under the Commission's rules, can "flow through" or pass on to their customers the increased costs of purchased water as a legitimate business expense. *Tariff Rule* 13.1.; 150 C.S.R. 2.

ter loss that was occurring within the municipality.

On June 5 and 7, 1995, the Commission entered orders invoking its jurisdiction and suspending the rates and charges imposed under Wheeling's May 2, 1995 ordinance. On June 30, 1995, Wheeling filed a motion to dismiss asserting that the Commission lacked subject matter jurisdiction under *W.Va.Code,* 24–2–4b(c)(2) [1994]. After responses from the District, Bethlehem, and the staff of the Commission, an administrative law judge, without a hearing, entered a recommended decision on July 21, 1995 finding jurisdiction based on the verified allegations of discrimination. The administrative law judge also found that Wheeling's motion to dismiss was not filed timely. On August 4, 1995, Wheeling filed its exceptions to the recommended decision. On August 7, 1995, the Commission, without a hearing, declined to rule on Wheeling's "interlocutory appeal."

On August 8, 1995, three days before a scheduled hearing, the staff of the Commission issued their recommendations, and the parties were notified that the formula underlying the staff's recommendations used West Virginia-specific demand factors, rather than the nationwide demand factors previously used by the Commission. During the August 11, 1995 hearing, the staff of the Commission presented the results of the class cost of service study they conducted using the West Virginia-specific demand factors. No competing data was presented by the parties at the August 11, 1995 hearing. Based on material presented by the staff of the Commission, the administrative law judge recommended that rates for resale customers be increased even more than the increase sought by Wheeling. The rates recommended by the administrative law judge were lower for certain other classes of customers and would result in substantially less revenue than under Wheeling's ordinance.

By order dated January 18, 1996, the Commission found that it had subject matter jurisdiction to consider the issue and adopted the recommendation that the rates for resale customers be increased.[2] Both Wheeling and the District appealed to this Court.

On appeal, Wheeling's main issue is whether the Commission has subject matter jurisdiction and the District's main issue is whether the Commission erred in changing its methodology for determining demand.

## II.

### *Discussion*

#### A.

##### *Jurisdiction*

Wheeling maintains that the Commission lacked subject matter jurisdiction because the District's petition for review of Wheeling's increased water rates failed to allege discrimination as required by *W.Va.Code,* 24–2–4b(c) [1994]. The Commission maintains that the allegations in the District's petition, which included the failure of Wheeling to perform a class cost of service study and the discriminatory imposition of certain costs to resale customers, were sufficient to meet the requirements of *W.Va.Code,* 24–2–4b(c)[1994].

■ We begin by noting that unless the conditions set forth in *W.Va.Code,* 24–2–4b(c) [1994], are met, the Commission is without jurisdiction to consider rate increases by municipally owned public utilities. In order for the Commission to review a rate increase by a municipality for customers residing outside the boundaries of the municipality, those customers must present "to the commission a petition alleging discrimination between customers within and without the municipal boundaries. Said petition shall be accompanied by evidence of discrimination...." *W.Va.Code,* 24–2–4b(c)(2) [1994].[3]

**2.** On October 12, 1995, the Commission affirmed the recommended decision and invited petitions for reconsideration. Reconsideration petitions were filed by Bethlehem, the District and the Commission's staff. No petition for reconsideration was filed by Wheeling. One of the District's arguments in its reconsideration petition concerned the use of West Virginia-specific factors.

**3.** Subsection c of *W.Va.Code,* 24–2–4b, also allows the Commission to review rates of municipality run utilities based on petitions from residential customers. *W.Va.Code,* 24–2–4b(c)[1994], provides:

The commission shall review and approve or modify such rates upon the filing of a petition within thirty days of the adoption of the ordi-

The Commission maintains that even though resident and non-resident customers are billed under the same rate schedule, discrimination may exist because class or classes of customers may be paying more than their share of the costs. The purpose of the class cost of service study is to determine if the various classes of customers are appropriately charged. In this case, because Wheeling did not conduct a class cost of service study, it had no evidence that the increased rates were not discriminatory.

In determining whether it has jurisdiction, the Commission uses a broad definition of discrimination, which includes determining rates based on a cost allocation among different classes of customers. However, in its appeal, Wheeling urges us to apply a narrow definition of discrimination, limiting the Commission's jurisdiction to cases in which different rates are charged based on where the customers live.

■ We apply a de novo review to interpretations of a statute. In Syllabus Point 1 of *Appalachian Power Co. v. State Tax Dept. of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995), we stated: "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." *See Phillip Leon M. v. Greenbrier County Bd. of Educ.*, 199 W.Va. 400, 484 S.E.2d 909 (1996).

■ Generally, an interpretation of a statute begins with an examination of the statute to determine if the intention of the Legislature is clear. When the intention of the Legislature is clear, the inquiry ends and the agency must conform with the legislative intent. This step of the process was set forth in Syllabus Point 3 of *Appalachian Power*, which states:

Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage.

■ However, when the Legislature's intent is not clear, *Appalachian Power* directs us to consider "whether the agency's answer is based on a permissible construction of the statute." In its entirety, Syllabus Point 4 of *Appalachian Power* states:

If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is *whether the agency's answer is based on a permissible construction of the statute.* A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory

nance or resolution changing said rates or charges by:

(1) Any customer aggrieved by the changed rates or charges who presents to the commission a petition signed by not less than twenty-five percent of the customers served by such municipally operated public utility, or twenty-five percent of the membership of the electric, natural gas or telephone cooperative residing within the state; or

(2) Any customer who is served by a municipally operated public utility and who *resides outside the corporate limits and who is affected by the change in said rates or charges and who*

presents to the commission a petition alleging discrimination between customers within and without the municipal boundaries. Said petition shall be accompanied by evidence of discrimination; or

(3) Any customer or group of customers who are affected by said change in rates who reside within the municipal boundaries and who present a petition to the commission alleging discrimination between said customer or group of customers and other customers of the municipal utility. Said petition shall be accompanied by evidence of discrimination. (emphasis added).

authority or is arbitrary or capricious. W.Va.Code, 29A–4–2 (1982). (emphasis added).

See Syllabus Points 1, 2 and 3, *State ex rel. Water Development Authority v. Northern Wayne County Public Service Dist.*, 195 W.Va. 135, 464 S.E.2d 777 (1995).

■ In this case, *W.Va.Code*, 24–2–4b(c)(2) [1994] requires the allegation of "discrimination" but fails to provide a definition of discrimination. We must now decide if the Commission's broad definition of discrimination "is based on a permissible construction of the statute." Syllabus Point 4, in part, *Appalachian Power*. The history of the statute is instructive because the Legislature amended *W.Va.Code*, 24–2–4b after our decision in *City of Benwood v. Public Service Comm'n*, 165 W.Va. 700, 271 S.E.2d 342 (1980)(*per curiam*), wherein we held that the Commission lacked jurisdiction because the same rates were applied to residents and non-residents. At the time of our decision in *Benwood*, *W.Va.Code*, 24–2–4b(c) [1979] provided for review by the Commission "only if the utility serves customers outside its corporate limits and those customers are charged at different rates than customers within the corporate limits." *Benwood*, 165 W.Va. at 702–3, 271 S.E.2d at 344.[4] Based on the limited right of review provided by the then effective statute, we found "only a different rate gives the Commission jurisdiction to hear the case" and upheld the Commission's dismissal based on a lack of jurisdiction. *Benwood*, 165 W.Va. at 703, 271 S.E.2d at 344. We find that our decision in *Benwood* was accurate based on the 1979 statute, but its holding is not applicable in this case because of the 1981 amendment to the statute.

In 1981, the Legislature amended this code provision making "discrimination" the triggering event for the Commission's jurisdiction. We note that Wheeling argues that "discrimination" should be limited to situations where different rates are applied to resident and non-resident customers, the *Benwood* situation. This interpretation would ignore the 1981 amendment and effectively limit the Commission's powers to review Wheeling's rates. Given the 1981 amendment, we find the Commission's interpretation of *W.Va.Code*, 24–2–4b(c)[1994] more plausible than Wheeling's interpretation.

Additional support for the Commission's interpretation is found in the stated legislative purposes for the Commission, namely to "[e]nsure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, applied in a manner consistent with the purposes and policies set forth in article two-a of this chapter, and *based primarily on the costs of providing these services.* (emphasis added)." *W.Va.Code*, 24–1–1(a)(4) [1986]. We also note that in *W.Va.Code*, 24–1–7 [1983], the Legislature granted the Commission broad discretion in evidentiary matters to facilitate its determination of "the right and justice of the matters before it."[5]

When the language and history of *W.Va. Code*, 24–2–4b [1994] is considered in conjunction with the stated purpose of the Commission, we find that the Commission's definition of discrimination "is based on a

---

4. Before its amendment in 1981, *W.Va.Code*, 24–2–4b(c) [1979] provided:

> If a municipally operated public utility serves customers outside its municipal corporate limits and these customers are charged at rates different from those which customers within *its* corporate limits are charged, the public service commission shall review and approve or order changes in such rates if the following conditions are met:
> (1) The complaining customers are those who reside outside the boundaries of the municipality which set the rates;
> (2) These customers allege that the rates to which they object are discriminatory; and
> (3) The request for a review of the rate or charge to which objection has been made is received by the public service commission within thirty days of the effective date of the adoption of the ordinance changing such rate or charge.

5. *W.Va.Code*, 24–1–7 [1983] states, in pertinent part:

> In the investigations, preparations and hearings of cases, the commission shall not be bound by the technical rules of pleading and evidence, but in that respect it may exercise such discretion as will facilitate its efforts to understand and learn all the facts bearing upon the right and justice of the matters before it.

permissible construction of the statute." Syllabus Point 4, in part, *Appalachian Power, supra.*

▇▇▇ Wheeling also argues that once the Commission found no discrimination, it lost its jurisdiction and should have terminated its inquiry.[6] However, Wheeling's loss of jurisdiction argument fails to consider *W.Va. Code,* 24–2–4b(f) [1994], which expressly invokes the Commission's power "upon receipt of a petition for review" and does not curtail that power if the petition's allegations are unfounded. *W.Va.Code,* 24–2–4b(f) [1994] states:

Upon receipt of a petition for review of the rates under the provisions of subsection (c) of this section, the commission may exercise the power granted to it under the provisions of section three of this article. The commission may determine the method by which such rates are reviewed and may grant and conduct a de novo hearing on the matter if the customer, electric, natural gas or telephone cooperative or municipality requests such a hearing.

In Syllabus Point 4, *State ex rel. Water Development Authority v. Northern Wayne County Public Service Dist.,* 195 W.Va. 135, 464 S.E.2d 777 (1995), we held:

"W.Va.Code, 24–2–3 (1983), clearly and unambiguously gives the Public Service Commission the power to reduce or increase rates whenever it finds that the

existing rate is unjust, unreasonable, insufficient, or unjustly discriminatory or otherwise in violation of any provision of W.Va. Code, 24–1–1, *et seq.*" Syl. pt. 2, *Central West Virginia Refuse, Inc. v. Public Service Commission,* 190 W.Va. 416, 438 S.E.2d 596 (1993).[7]

▇▇▇ We find no merit in Wheeling's contention that the Commission erred in failing to hold a hearing on the jurisdictional issue. We note that in its motion to dismiss, Wheeling did not request a hearing and Wheeling fails to cite to any statutory requirement for a hearing. The Commission provided a timely, although adverse, answer to Wheeling, indicating the Commission had considered the matter. Similarly, we find no merit in Wheeling's assignment of error concerning the Commission's rejection of its motion to dismiss as untimely. The record shows that although Wheeling's motion was not timely filed, the Commission considered the motion on its merits and did not summarily reject it. The administrative law judge's recommended decision noted that the motion was untimely and did not consider the explanation offered for the late filing.[8] Essentially the untimely notation was an afterthought, designed to encourage compliance with procedural requirements. Because the Commission considered the merits of Wheeling's motion, we find no error in the notation by the Commission that Wheeling's motion to dismiss was not filed timely.

---

**6.** *See infra* Section II.B. for a discussion of the evidence of discrimination and the Commission's decision.

**7.** *W.Va.Code,* 24–2–3 [1983], provides, in pertinent part:

The commission shall have power to enforce, originate, establish, change and promulgate tariffs, rates, joint rates, tolls and schedules for all public utilities: Provided, That the commission may exercise such rate authority over municipal utilities only under the circumstances set forth in section four-b of this article. And whenever the commission shall, after hearing, find any existing rates, tolls, tariffs, joint rates or schedules unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission shall by an order fix reasonable rates, joint rates, tariffs, tolls or schedules to be followed in the future in lieu of those found to be unjust, unreasonable, insuffi-

cient or unjustly discriminatory or otherwise in violation of any provisions of law. . . .

**8.** Wheeling filed its motion to dismiss on June 30, 1995. *Municipal Appeal Rule* 2.3(d) (150 C.S.R. 10) requires a jurisdictional challenge to be filed within 15 days of the notification of the Commission's assertion of jurisdiction, except upon a showing of good cause. Wheeling's motion to dismiss was filed 22 days after receipt of the Commission's June 7, 1995 order. In its petition, Wheeling maintains it had "good cause" for late filing because: first, a lawyer was not retained until 3 days before the deadline, and second, the lawyer was busy with three other Commission cases. Apparently, the Commission did not find that Wheeling presented "good cause" because the Commission's order indicated that Wheeling's motion to dismiss was not filed timely. Because the Commission determined the merits of Wheeling's motion to dismiss, we need not discuss whether "good cause" was shown.

■ Given the Legislature's grant of broad discretion to the Commission, we find that the Commission did not err in determining that the allegations in the District's petition were sufficient to invoke the Commission's jurisdiction under *W.Va.Code,* 24–2–4b(c)[1994], and therefore, we find no error in the Commission's determination of jurisdiction and the Commission's continued exercise of its powers in this case.

### B.

### *Methodology*

Although the District agrees that the Commission had jurisdiction to consider Wheeling's rate increase, the District maintains that the Commission erred in the methodology it used to determine rates. Before this case, the Commission, in determining the proper allocation of costs among classes of customers, used demand factors from a nationwide study by the American Water Works Association. However, because the Commission acquired different demand factors based on a West Virginia study, the Commission's staff used the West Virginia demand data to determine that Wheeling's rate ordinance was undercharging the resale customers. Three days before the scheduled hearing, the parties received the recommendations of the Commission's staff that were based on the West Virginia demand data and not the nationwide data. According to testimony from the Commission's staff, the use of nationwide demand data would have resulted in the staff recommending a reduction in rates for the resale customers.[9] However, the use of West Virginia demand data resulted in the opposite recommendation, namely an increase in the rates charged to resale customers.

On appeal, the District argues: first, that the Commission erred in relying on unproven data, when it should have relied on the accepted nationwide data; and, second, that the District was prejudiced because the Commission gave it only three days notice of the substantial change in methodology.

■ Although the Commission is not bound by the technical rules of evidence (*W. Va.Code,* 24–1–7 [1983]), Rules 702 [1985], 703 [1994] and 104(a) [1994] of the *West Virginia Rules of Evidence* are instructive. Rule 702 is the paramount authority for determining whether an expert is qualified to give an opinion.[10] Generally, the trial judge should determine whether the expert's opinion has a reliable foundation and whether the expert's opinion is relevant to the issue before the court. The test for admissibility of expert testimony under Rule 702 was outlined in Syllabus Point 2 of *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied,* 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), which states:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific

---

9. During the August 11, 1995 hearing, Diane Davis Calvert, Senior Utilities Analyst for the Commission's staff, said:

> [O]ur Class Cost of Service Study shows that resale customers are not paying enough. But that is dependent upon or studying the way we conducted that study. If you would take our last Class Cost of Service Study for The City of Wheeling and just use different record department numbers, what has changed from that case to this case, whether they were power expenses, or payroll expenses, or debt service, you might not find that would be the case. Part of what has happened in this case, is the change in Staff's methodology ... [Y]ou could

probably show based on our old methodology and the current cost, if we continued that methodology, that the resale customers truly might not need as much of an increase as the overall percentage increase.

10. Rule 702 [1985], *W.Va. R.E.* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

*In accord*, Syllabus Point 3, *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994).

◼ Rule 703 allows an expert to base an opinion on personal observation, facts admissible in evidence and information otherwise inadmissible, if this type of information is reasonably relied upon by experts in the witness's field.[11] *See* Syllabus Point 6, *Mayhorn v. Logan Medical Foundation, supra;* Syllabus Point 2, *Wilkinson v. Bowser*, 199 W.Va. 92, 483 S.E.2d 92 (1996). Rule 104(a) allows the court to determine preliminary questions concerning qualification of an expert and the admissibility of evidence.[12] Syllabus Point 6 of *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700, *cert. denied*, 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991) provides: "The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." *In accord* Syllabus Point 4, *Stone v. United Engineering, a Division of Wean, Inc.*, 197 W.Va. 347, 475 S.E.2d 439 (1996).

◼ Both parties agree that the type of data relied upon by the Commission is the "type reasonably relied upon by experts." Rule 703. However, the District argues that the West Virginia-specific data were unproven. The Commission was "fairly confident that the empirical data gleamed from the placement of recorders on the meters of WVAWC [West Virginia–American Water

Co.] actual individual groups of customers, including larger consumption customers such as resale customers, is of more appropriate and probative value than the AWWA's [American Water Works Ass'n] broad nationwide assumption."

◼ Given the Commission's acknowledged expertise, we find no error in allowing the testimony of Ms. Calvert of the Commission's staff as an expert. We also note that the District had an opportunity, through cross-examination, to alert the administrative law judge to the change in methodology and to question the use of West Virginia demand data. The District did not present a different class cost of service study, but instead, argued in favor of the use of nationwide data over West Virginia-specific data. We find that in this case, the Commission did not abuse its discretion in applying the West Virginia-specific data.

◼ The District argues that it was hampered because it received only three days' notice that the Commission's staff was using the West Virginia-specific data. The Commission acknowledges that the staff's recommendations were available only three days before the hearing but disputes the District's claim that it was surprised or disadvantaged.

The Commission argues that counsel for the District should not have been surprised because of his earlier involvement in a case where specific storage tank capacity was used to modify the nationwide data, and any disadvantage could have been alleviated by the District. The record shows that the District did not seek a continuance and did not request leave to present competing information either to the administrative law judge or in its petition of rehearing. The District argues that because requests for continuances must be filed five days before a hear-

---

11. Rule 703 [1994], *W.Va. R.E.* states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

12. Rule 104(a) [1994], *W.Va. R.E.*, states:

Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

ing, the three days notice of the methodology change deprived it of the opportunity to request a continuance. Even if the time constraints foreclosed the District from requesting a continuance before the hearing, it failed to take advantage of post-hearing opportunities to present a competing study or a critical analysis of the West Virginia data. When we consider that the District fully participated in the hearing, including a cross-examination of the Commission's staff, and that the District had opportunities to present additional evidence, we find no merit to the District's contention that their representation was hampered by the brief notice of the change in methodology.

We conclude by noting that our standard of review grants substantial deference to the Commission. In Syllabus Point 1, *Sexton v. Public Service Comm'n*, 188 W.Va. 305, 423 S.E.2d 914 (1992), we stated:

> " '[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. The Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1 (1957). Syllabus Point 5, in part, *Boggs v. Public Service Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970)." Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission*, 180 W.Va. 387, 376 S.E.2d 593 (1988).

In Syllabus Point 2 of *Chesapeake and Potomac Telephone Co. of West Virginia v. Public Service Comm'n*, 171 W.Va. 494, 300 S.E.2d 607 (1982), we held that "[t]his Court will not substitute our judgment for that of the Public Service Commission on controverted evidence." However, clearly wrong orders of the Public Service Commission will be reversed. *See* Syllabus Point 2, *Mountain Trucking Co. v. Public Service Comm'n*, 158 W.Va. 958, 216 S.E.2d 566 (1975).

Applying this standard to the present case, we conclude that the Commission did not err in using of a formula based on West Virginia data, rather than nationwide data.

For the above stated reasons, the order of the Public Service Commission of West Virginia issued on January 18, 1996 is affirmed.

Affirmed.