566 S.E.2d 294

**COOKMAN REALTY GROUP, INC.,**
Defendant Below, Appellee,

v.

**Barbara TAYLOR, Chief, Office of Water Resources, Division of Environmental Protection, Plaintiff Below.**

**The West Virginia Department of Environmental Protection, Appellant.**

**No. 30116.**

Supreme Court of Appeals of West Virginia.

Submitted March 12, 2002.

Decided June 19, 2002.

Concurring Opinion of Justice Albright June 25, 2002.

Concurring Opinion of Justice Starcher July 3, 2002.

Leonard B. Knee, Esq., Bowles Rice McDavid Graff & Love, Charleston, for Appellee.

Perry D. McDaniel, Esq., Martha E. Barber, Esq., Charleston, for Appellant.

PER CURIAM.

The West Virginia Department of Environmental Protection ("DEP") appeals a lower court judgment that construed the Groundwater Protection Act, W. Va.Code §§ 22–12–

1 to –14, and an accompanying regulation, W. Va.C.S.R. § 47–57–4.1 (1994), as precluding DEP from ordering appellee Cookman Realty Group, Inc. ("Cookman Realty") to eliminate motor-oil contamination from its property in Grant County absent evidence that Cookman Realty was the originator of such pollution. DEP argues that the circuit court erred in failing to afford proper deference to its interpretation of its own legislative rule, which DEP argues is ambiguous as to the reach of the agency's power to order remediation. We conclude that the subject regulation clearly and unambiguously limits the agency to requiring remediation only from those who originate contamination that results in a threat to groundwater, and accordingly affirm the circuit court's judgment.

## I.

### BACKGROUND

Appellee, the Cookman Realty Group, Inc., purchased a parcel of unimproved land in Petersburg, West Virginia, in 1993. Later, in September 1995, a petroleum substance, together with discarded oil filters, was observed on the property in a ditch that had been excavated for the purpose of installing a storm drain. Cookman Realty subsequently entered into negotiations to sell the subject property to the South Branch Valley Bank in July 1996, which resulted in an environmental site assessment being performed by Triad Engineering, Inc. ("Triad"). Triad's resulting report, a copy of which was furnished to DEP, indicated the presence of motor-oil contamination in both the soil and groundwater underlying the southwestern boundary of property. The report concluded that the pollution most likely emanated from an adjacent parcel owned by Petersburg Motor Company, Inc. ("Petersburg Motor"), which has been in the business of selling and servicing automobiles since 1944.

Apparently as a result of Cookman Realty's self-reporting, DEP requested that additional investigation be undertaken to determine the full extent of contamination. A

second report issued by Triad in June 1997 confirmed that the pollution was concentrated in the southwestern corner of Cookman Realty's property, with contamination levels dropping significantly in proportion to the distance from the Petersburg Motor parcel.[1]

Based upon these reports, DEP, through its Office of Water Resources, issued Order No. 4059 on August 21, 1998. This administrative order was issued under the authority of the Groundwater Protection Act (the "Act"), and requires both Cookman Realty and Petersburg Motor to undertake remediation of their respective properties. Under the Act, the Environmental Quality Board (the "Board") is authorized to establish standards regarding the "purity and quality for groundwater of the state...." W. Va.Code § 22–12–4(a) (1994) (Repl.Vol. 1998). The Act further provides that

[w]here the concentration of a certain constituent exceeds such [groundwater quality] standard due to human-induced contamination, no further contamination by that constituent is allowed, and every reasonable effort shall be made to identify, remove or mitigate the source of such contamination, and to strive where practical to reduce the level of contamination over time to support drinking water use.

W. Va.Code § 22–12–4(b). DEP is correspondingly charged with the responsibility to

develop groundwater protection practices to prevent groundwater contamination from facilities and activities within their respective jurisdictions consistent with this article. Such practices shall include, but not be limited to, criteria related to facility design, operational management, closure, remediation and monitoring. Such agencies shall issue such rules, permits, policies, directives or any other appropriate regulatory devices, as necessary, to implement the requirements of this article.

W. Va.Code § 22–12–5(d) (1994) (Repl.Vol.

---

1. DEP also requested Petersburg Motor to undertake a similar environmental assessment of its property. Two reports were subsequently prepared by Potesta & Associates in December 1997

and April 1998, both of which found high levels of motor-oil contamination on the Petersburg Motor property.

1998).[2] DEP is expressly authorized to propose legislative rules implementing the provisions of the Act, as governed by the requirements of the West Virginia Administrative Procedures Act.[3] *See* W. Va.Code § 22–12–5(c) (1994) (Repl.Vol. 1998).

DEP has exercised this delegated authority, resulting in the promulgation of, among other regulations, W. Va.C.S.R. § 47–57–4.1 (1994):

> Except for any source or class of sources which has been granted a variance for the particular contaminant at issue, *any person who owns or operates a source subject to the Act which has caused, in whole or in part, the concentration of any constituent to exceed any applicable groundwater quality standard subject to the Act,* must cease further release of that contaminant and must make every reasonable effort to identify, remove or mitigate the source of such contamination and strive where practical to reduce the level of contamination over time to support drinking water use of such groundwater.

(Emphasis added.) The regulations specify that a "source" is to be understood to mean "any facility or activity which has caused a release or is reasonably likely to cause a release," W. Va.C.S.R. § 47–57–2.13 (1994), with a "release" being defined, in relevant part, as "any act or omission that results in the . . . leaching of materials or contaminants in a manner that has caused . . . entry of a constituent to groundwater." W. Va.C.S.R. § 47–57–2.12 (1994).

Cookman Realty appealed DEP's Order No. 4059 to the Environmental Quality Board on September 22, 1998.[4] Following an evi-

dentiary hearing, where evidence was presented tending to show that the detected contamination was the result of Petersburg Motor's long-standing practice of spilling and disposing of used motor oil along the southwestern corner of the Cookman Realty property, the Board vacated DEP's remediation order by a decision issued on May 20, 1999. The Board found as a matter of fact that the pollution in question was "caused" by Petersburg Motor, rather than Cookman Realty. While expressly recognizing DEP's authority under the Act to order the cleanup of pollution that threatens groundwater, the Board nevertheless determined as a matter of law that under W. Va.C.S.R. § 47–57–4.1, "the source that caused the contamination is responsible for remediating the contamination."

DEP, in turn, sought judicial review of the Board's decision in the Circuit Court of Grant County pursuant to W. Va.Code § 22B–1–9(a) (1994) (Repl.Vol. 1998). The lower court upheld the Board's action in vacating DEP's remediation order, likewise concluding that § 47–57–4.1 "place[s] responsibility for remediation on the owner of the source which has caused the contamination." In reaching this legal conclusion, the circuit court applied a *de novo* standard of judicial review, and expressly chose to afford no deference at all to DEP's interpretation of its own regulation:

> DEP's interpretation of the Groundwater Protection Act in this proceeding is not entitled to deference. First, DEP's interpretation matters only if the regulations are ambiguous, and thus need interpretation. Here the regulations are clear. Second, since DEP's interpretation is a litiga-

---

2. The Act expressly grants the Director of DEP the authority to remedy violations of groundwater quality standards through the issuance of administrative orders:

> If any such official upon inspection, investigation or through other means observes, discovers or learns of a violation of the provisions of this article, or any permit, order or rules issued to implement the provisions of this article, he or she may issue an order stating with reasonable specificity the nature of the violation and requiring compliance immediately or within a specified time. An order under this section includes, but is not limited to, any or all of the following: Orders implementing this article which (1) suspend, revoke or modify

permits; (2) require a person to take remedial action; or (3) are cease and desist orders. W. Va.Code 22–12–10(f) (1994) (Repl.Vol. 1998); *see also* W. Va.C.S.R. § 47–58–8.1 (1994) (stating, in part, that "[t]he Division has the authority to order persons to conduct remedial actions").

3. The West Virginia Administrative Procedures Act is codified at W. Va.Code §§ 29A–1–1 to 29A–7–4 (Repl.Vol. 1998).

4. Petersburg Motor's appeal of the administrative order was dismissed after it entered into a settlement agreement with DEP.

tion position, no deference is due it. Third, DEP is entitled only to deference when interpreting its own regulations. The regulation cited by DEP in issuing Order No. 4059[was] not [promulgated] by DEP, but by the Board. The Board owes *no deference to DEP's* interpretation of the Board's regulation.

It is from this order that DEP now appeals.[5]

## II.

### DISCUSSION

In this case, DEP argues that W. Va. C.S.R. § 47–57–4.1 is ambiguous, and therefore the lower court was obligated to defer to what the agency maintains is a permissible construction of the regulation based upon this Court's holding in *Appalachian Power Co. v. State Tax Dep't of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995). Cookman Realty counters by asserting that the subject regulation unambiguously limits responsibility for remediation to parties who have caused pollution that may result in the contamination of groundwater, and further contends, in accord with the reasoning of the circuit court, that no deference should be extended to DEP's construction of § 47–57–4.1 because the agency's stance on this issue amounts to nothing more than an informal litigation position. *See West Virginia Health Care Cost Review Auth. v. Boone Mem'l Hosp.,* 196 W.Va. 326, 334, 472 S.E.2d 411, 419 (1996) (noting that "Courts customarily withhold [*Appalachian Power-*]*Chevron* deference from agencies' litigating positions") (citation omitted).

■ We need not go so far in this case as to define what deference, if any, must be afforded an administrative agency's interpretation of its own legislative rule, since the regulations at issue here unambiguously limit administratively-enforced remediation to parties who have actually caused or originated

pollution that threatens groundwater. A reviewing court would only be required to afford deference to an agency's interpretation if the regulation contained an ambiguity. As we have frequently admonished, "[a] statute, or administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten." Syl. pt. 1, *Consumer Advocate Div. of Pub. Serv. Comm'n v. Public Serv. Comm'n of West Virginia,* 182 W.Va. 152, 386 S.E.2d 650 (1989); *see also id.* at 156, 386 S.E.2d at 654 ("Interpretation of statutes or rules and regulations is proper only when an ambiguity exists."); syl. pt. 3, *Crockett v. Andrews,* 153 W.Va. 714, 172 S.E.2d 384 (1970) ("While long standing interpretation of its own rules by an administrative body is ordinarily afforded much weight, such interpretation is impermissible where the language is clear and unambiguous."); syl. pt. 1, *English Moving & Storage Co. v. Public Serv. Comm'n of West Virginia,* 143 W.Va. 146, 100 S.E.2d 407 (1957) (stating in context of administrative rule that "[w]hen a valid written instrument is clear and unambiguous it will be given full force and effect according to its plain terms and provisions").

■ The text of W. Va.C.S.R. § 47–57–4.1 requires, among other things, that remediation be undertaken by "any person who owns or operates a source ... which has caused ... the concentration of any constituent to exceed any applicable groundwater quality standard ...." Since the contamination on the Cookman Realty property is unquestionably causing a violation of groundwater quality standards, the crucial question is whether such pre-existing contamination produced by a party unrelated to the landowner may be deemed a "source" under the regulations.

■ The term "source" is elsewhere defined to mean "any facility or activity which has caused a release or is reasonably likely to cause a release." W. Va.C.S.R. § 47–57–2.13. Since neither "facility" nor "activity"

---

5. Although not part of the record of this case, it appears that Cookman Realty eventually brought a civil action against Petersburg Motor alleging trespass, nuisance, and negligence in connection with its conduct in causing the contamination at issue herein, and has obtained a judgment in the amount of $586,400, including $20,900 in punitive damages. Cookman Realty has represented

to the Court that it will use any money recovered in connection with this judgment to pay for the removal of the subject contamination. The Court is not faced here with the issue of whether such recovery on the part of Cookman Realty would subject it to a duty to remediate under the Act, and we therefore leave such question for another day.

are defined in the regulations, such terms must be given their common, ordinary and accepted meanings. *See* syl. pt. 3, in part, *Ohio Cellular RSA Ltd. P'ship v. Board of Pub. Works of West Virginia,* 198 W.Va. 416, 481 S.E.2d 722 (1996) ("In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning.") (internal quotations and citations omitted).[6] The undeveloped parcel of land owned by Cookman Realty, which according to the record in this case has never been used by any of its current or former owners for any activity involving the storage, use, or disposal of hazardous materials, is obviously not a "facility." That term is delimited to mean "something defined, built, installed, etc., to serve a specific function affording a convenience or service." *Random House Webster's Unabridged Dictionary* 690 (2d ed.1997). We likewise fail to see how Cookman Realty's use of the property, or that of any of its predecessors in title, could be deemed an "activity" under the regulation, as this otherwise undefined term would ordinarily denote some positive act on the part of the landowner. *See id.* at 20 (defining the word "activity" to mean, *inter alia,* "the state or quality of being active").

 A cardinal rule of textual interpretation requires, of course, that statutes and administrative rules " 'be construed as a whole, so as to give effect, if possible, to every word, phrase, paragraph and provision thereof.' " *Weirton Med. Ctr., Inc. v. West Virginia Bd. of Med.,* 192 W.Va. 72, 75, 450 S.E.2d 661, 664 (1994) (quoting syl. pt. 8, in part, *Vest v. Cobb,* 138 W.Va. 660, 76 S.E.2d 885 (1953)); *see also State ex rel. Johnson v. Robinson,* 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979) (recognizing rule of construction that "the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning"). And here the regulation goes on to define the term "release" as "any act *or omission* that results in the spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of materials or contaminants in a manner that has caused or is reasonably likely to cause the entry of a constituent to groundwater." W. Va.C.S.R. § 47–57–2.12 (emphasis added). DEP tacitly argues that W. Va.C.S.R. § 47–57–4.1 is ambiguous in that it is at least arguable that a landowner's "omission" in failing to stop contamination from further "leaching" into groundwater may form a basis for liability under the regulations. We disagree.

Although a "release" may indeed arise from an "omission," there still remains the limitation that a landowner, in order to be deemed the owner of a "source," must be in control of a "facility" or otherwise engaged in an "activity" that causes such a release. In other words, contrary to DEP's suggestion, there is nothing in the regulations' use of the term "omission" that serves to modify or render ambiguous the requirement that a landowner must be engaged in an "activity" in order to incur a duty to remediate. Rather, employment of the word "omission" in § 47–57–2.12 merely permits DEP to order remediation where a property owner or its privy has engaged in some positive activity involving hazardous substances and, as a result of an omission or oversight, caused such materials to be released into the environment. The regulations simply could not be more clear that a "source" of groundwater pollution does not include the form of passive land ownership and unauthorized depositing of contaminants involved in this case. We therefore reject DEP's contention that the regulation is ambiguous in this respect.

In sum, we hold that W. Va.C.S.R. § 47–57–4.1 and its accompanying definitions unambiguously provide that a landowner may not be deemed the owner of a "source" of

---

**6.** *Accord* syl. pt. 4, *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. 137, 107 S.E.2d 353 (1959) ("Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use."); syl. pt. 1, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941) ("In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used."), *overruled on other grounds by Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982).

groundwater contamination—and thus subject to a remediation order issuing from DEP—where it is demonstrate that neither the landowner nor its predecessors in title were involved in originating such pollution. The evidence is undisputed that Petersburg Motor, rather than Cookman Realty, was the sole source of the contamination at issue in this case. Consequently, we find no error in the judgment of the lower court.

## III.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Grant County is affirmed.

Affirmed.

ALBRIGHT, Justice, concurring.

(Filed June 25, 2002)

While I concur in the judgment and result in this case, I write separately because I believe that the conclusion reached is supported by law other than that cited by the majority. In my judgment, syllabus point three of *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970), appearing as syllabus point two in the instant case, is not applicable to agencies such as the West Virginia Department of Environmental Protection (DEP) which are subject to the provisions of the Administrative Procedures Act (APA), West Virginia Code §§ 29A–1–1 to 29A–7–4 (Repl. Vol. 1998). *Crockett* involved the interpretation of rules and regulations by a city police civil service commission, a municipal administrative agency not governed by the provisions of the APA. *See* West Virginia Code § 29A–1–2(a) (1982) (defining what constitutes an agency subject to the APA).

A pertinent provision of the APA with regard to the present case is West Virginia Code § 29A–1–2(c), which defines an interpretive rule to mean "every rule . . . adopted by an agency independently of any delegation of legislative power which is intended . . . to provide information or guidance to the public regarding the agency's interpretations, policy or opinions upon the law enforced or administered by it." While it is unclear whether the interpretation by DEP of West Virginia C.S.R. § 47–57–4.1 (1994), at issue in the case before us, has even been given the dignity of an interpretive rule, it is clear from the record that the DEP interpretation is not found in any legislatively approved rule. Therefore, it is no more effective than a properly promulgated interpretive rule of the agency.

In such circumstances, a state agency's interpretation may not be afforded any weight in light of the further language in West Virginia Code § 29A–1–2(c), which reads as follows:

> An interpretive rule may not be relied upon to impose a civil or criminal sanction nor to regulate private conduct or the exercise of private rights or privileges nor to confer any right or privilege provided by law and is not admissible in any administrative or judicial proceeding for such purpose, except where the interpretive rule established the conditions for the exercise of discretionary power as herein provided.

In light of this unmistakably clear legislative language, such an interpretation of a policy by an administrative agency may not be used by a court or administrative agency against the interests of a person regulated or sought to be regulated by the agency. I believe that a new syllabus point should have been adopted by the Court in this case stating that the longstanding interpretations by a state agency of rules it is required to enforce—whether stated in an interpretative rule under the APA or set forth in a less formal expression of agency policy—may not be afforded any weight against a citizen or other party in a contested action of the nature before us.

STARCHER, Justice, concurring.

(Filed July 3, 2002)

In the instant case, the West Virginia Department of Environmental Protection ("DEP") appeals a lower court judgment that construed the Groundwater Protection Act, *W.Va.Code*, 22–12–1 to –14, and an accompanying regulation, W.Va.C.S.R. § 47–57–4.1 (1994), as precluding DEP from ordering appellee Cookman Realty Group, Inc. ("Cookman Realty") to eliminate motor-oil contami-

nation from its property in Grant County absent evidence that Cookman Realty was the originator of such pollution. The DEP argues that the circuit court erred in failing to afford proper deference to its "policy" interpretation of its own legislative rule, which the DEP argues is ambiguous as to the reach of the agency's power to order remediation.

The Court's opinion holds that there is no ambiguity in the text of the subject regulation; I do not differ with that holding. The concurrence by Justice Albright states that even if there were some ambiguity in the statute or regulation at issue in the instant case, the agency's "policy" interpretation of the regulation, at best an interpretive rule, is not formulated pursuant to discretion given by statute to the DEP; and therefore may not be used against Cookman. *W.Va.Code*, 29A-1-2(c) [1982]. I agree with this point also.

I write separately to emphasize the point that in general, while an agency's interpretation of its own regulations should not *ipso facto* be given deference, the agency's views should nevertheless be recognized and given *the weight that their own persuasiveness demands*. The proper approach is the "multifactor approach" of *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

In *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995), this Court undertook to define the standard governing judicial review of an agency's construction of a *statute* that the agency was charged by law with administering. As a starting point, we noted in Syllabus Point 1 of *Appalachian Power* that "[i]nterpreting a statute or a regulation presents a purely legal question subject to *de novo* review." This point was qualified, however, by a recognition that "an inquiring court—even a court empowered to conduct *de novo* review—must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion." 195 W.Va. at 582, 466 S.E.2d at 433.

Borrowing heavily from federal case law on the subject, Syllabus Point 3 of *Appala-*

*chian Power* directs that a reviewing court first ascertain whether a statute is silent or ambiguous as to a particular matter so as to sanction an independent interpretation on the part of the administrative agency:

Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage.

Where clear evidence of legislative intent is lacking, a reviewing court is obligated to defer to a reasonable construction placed upon a statute by an agency's legislative rule. As we instructed in Syllabus Point 4 of *Appalachian Power*,

If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va.Code, 29A-4-2 (1982).

*Accord*, Syllabus Point 3, *City of Wheeling v. Public Service Comm'n*, 199 W.Va. 252, 483 S.E.2d 835 (1997) (per curiam); Syllabus Point 5, *West Virginia Health Care Cost Review Authority v. Boone Memorial Hosp.*, 196 W.Va. 326, 472 S.E.2d 411 (1996).

*Appalachian Power,* as noted, dealt with an agency's construction of a *statute* through the promulgation of a legislative rule which itself had the force of law. While there is language in *Appalachian Power* that appears to support DEP's reliance upon the *Chevron* approach in context of *rules, see* 195 W.Va. at 586 n. 13, 466 S.E.2d at 437 n. 13 (noting that second step of *Chevron* analysis would apply in the "unlikely event that we found that a legislative rule, valid in all respects, was itself ambiguous as to its intent or meaning"), this Court, I believe, will clearly not extend full-blown *Appalachian Power–Chevron* deference to an agency's informal interpretation of its own regulation.

Admittedly, the principle that an administrative agency should be afforded substantial deference with respect to its interpretation of a regulation penned by its own hand has a firm basis in federal case law that predates the United States Supreme Court's adoption of the *Chevron* standard. In *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), the Court held that an administrative agency's construction of its own ambiguous regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 414, 65 S.Ct. at 1217. Under this standard of judicial review, an agency's interpretation of an ambiguous regulation controls "so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations" *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 1176, 113 L.Ed.2d 117 (1991) (internal

citations and quotations omitted); *see also Shalala v. Guernsey Mem. Hosp.,* 514 U.S. 87, 94–95, 115 S.Ct. 1232, 1236, 131 L.Ed.2d 106 (1995) (applying rule that reviewing court must defer to a "reasonable regulatory interpretation"); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (stating that HHS Secretary's interpretation of agency regulations is entitled to "substantial deference"); *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986) (an "agency's construction of its own regulations is entitled to substantial deference"). The Supreme Court has consistently reaffirmed this principle,[1] and has gone so far as to apply this form of controlling deference to an agency pronouncement set forth in the relatively informal medium of an *amicus* brief. *See Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997) (holding that *Seminole Rock* standard applies in such context so long as there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question").

The justifications given for *Seminole Rock* and *Chevron* have much in common,[2] and there has thus far been little to distinguish the two lines of cases with respect to their application. *See Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 584 (D.C.Cir.1997) (noting that "[i]t would seem that there are few, if any, cases in which the standard applicable under *Chevron* would yield a different result that the 'plainly erroneous' or 'inconsistent' standard set forth in

---

**1.** The *Seminole Rock* standard was most reaffirmed by dictum in *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), where the Court otherwise rejected the contention that *Chevron* deference should apply to an agency's interpretation of a statute contained within an opinion letter. Some commentators have argued that *Christensen* is emblematic of the "strikingly inconsistent" positions taken by the Court, where it has "repudiated strong deference for agency interpretations of ambiguous statutes contained in formats lacking the force of law, while apparently endorsing strong deference for agency interpretations of ambiguous regulations contained in such formats." Robert A. Anthony & Michael Asimow, *The Court's Deferences—A Foolish Inconsistency,* Admin. & Reg. L. News 10 (Fall 2000).

**2.** *Chevron* deference has been justified on the basis of an express or implied delegation of authority from the Congress. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Although the rationale underpinning the holding in *Seminole Rock* has not been explained with the same clarity, the Supreme Court has been stated that "[b]ecause applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Martin,* 499 U.S. at 151, 111 S.Ct. at 1176.

[*Seminole Rock* ] . . . ."). Indeed, some federal courts have expressly applied *Chevron* in contexts where *Seminole Rock* would be more appropriate. *See, e.g., Samsung Elecs. Am., Inc. v. United States,* 106 F.3d 376, 378 (Fed.Cir.1997) (deferring to Customs Service's interpretation of its own regulation under *Chevron* ); *Malcomb v. Island Creek Coal Co.,* 15 F.3d 364, 369 (4th Cir.1994) (applying *Chevron* deference to an agency's interpretation of its own regulations).

A number of commentators have, however, lodged strong objections to giving administrative agencies *Chevron*-type interpretive powers with respect to their own regulations. One of the more persuasive arguments against continued adherence to *Seminole Rock* posits that permitting an agency to have broad power to interpret its own regulations violates constitutional separation-of-powers restrictions by uniting the law-making and law-exposition functions in the same agency hands. *See* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretation of Agency Rules,* 96 Colum. L.Rev. 612, 638–654 (1996). According to this critique, *Chevron* and *Seminole Rock* operate quite differently:

> In a *Chevron* case, the reviewing court asks whether agency action—usually the promulgation of a rule, an agency enforcement action, or an adjudication—is consistent with an authorizing statute. If the reviewing court is effectively bound by the agency's interpretation of the statute, separation remains between the relevant lawmaker (Congress) and at least one entity (the agency) with independent authority to interpret the applicable legal text. In contrast, under *Seminole Rock,* the reviewing court asks whether the agency action— typically an enforcement action or adjudication—is consistent with an agency regulation. In those circumstances, if the court is bound by the agency's interpretation of the meaning of its own regulation, there is no independent interpreter; the agency lawmaker has effective control of the exposition of the legal text that it has created. In short, whereas *Chevron* retains one independent interpretive check on lawmaking by Congress, *Seminole Rock* leaves in

place *no* independent interpretive check on lawmaking by an administrative agency. *Id.* at 639 (footnotes omitted). Thus, under this reasoning, it is constitutionally imperative for the courts to "impos[e] an independent judicial check on agencies' interpretations of their own regulations." *Id.* at 682.

*Seminole Rock* has also been criticized for fostering the promulgation of ambiguous regulations. As one observer has stated, *Seminole Rock* "generates incentives to be vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." Robert A. Anthony, *The Supreme Court and the APA: Sometimes They Just Don't Get It,* 10 Admin. L.J. of Am.U. 1, 12 (1996); *see* Manning, *supra,* at 655 (noting that *Seminole Rock* "removes an important affirmative reason for the agency to express itself clearly; since the agency can say what its own regulations mean . . . the agency bears little, if any, risk of its own opacity or imprecision"); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 525, 114 S.Ct. 2381, 2393, 129 L.Ed.2d 405 (1994) (Thomas, J., dissenting) ("It is perfectly understandable, of course, for an agency to issue vague regulations, because to do so maximizes agency power and allows the agency greater latitude to make law through adjudication rather than through the more cumbersome rulemaking process.").

In addition to reducing the efficacy of notice-and-comment rule-making procedures, it is further argued that the incentives for ambiguity provided by *Seminole Rock* increase the potential for governmental arbitrariness, since vague regulations provide neither regulators nor regulated parties with explicit guidance as to the standard by which particular conduct must be measured. *See* Manning, *supra,* at 669–74. It is likewise pointed out that any system which increases an agency's proclivity to promulgate vague regulations increases the potential that the agency's actions will come under the control of special interests: "If *Seminole Rock* makes for systematically more indefinite regulations and provides that the regulations mean anything the agency says they mean (within a very broad range), then it becomes far more

difficult for an agency to cite its own regulations as a source for resisting blandishments or threats from legislators acting on behalf of organized, but not broadly representative, interest groups." *Id.* at 680.

Based upon these shortcomings, it has been argued that *Seminole Rock* should be abrogated, and that the federal courts should instead apply the multi-factor approach of *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See* Manning, *supra*, at 686–96; *cf.* Anthony, *supra*, at 34 (expressing view that Supreme Court "should make clear ... the circumstances in which reviewing courts should not 'defer' to agency interpretations, but should form their own interpretations after extending appropriate consideration to agency views"). *Skidmore* places an emphasis upon the "specialized experience and broader investigations and information available to the agency," 323 U.S. at 139, 65 S.Ct. at 164, and instructs that

> the rulings, interpretations and opinions of [an administrator], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight [accorded an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140, 65 S.Ct. at 164. In the present context, Professor Manning argues that because it "places the burden of persuasion upon the agency to convince a reviewing court of the meaning of the relevant legal text, *Skidmore* satisfies the constitutionally-inspired requirement of an independent interpretive check." Manning, *supra*, at 687. Furthermore, "unlike *Seminole Rock, Skidmore* would more generally encourage regulatory clarity by placing a premium on well-explained agency accounts of regulatory meaning." *Id.*

I believe that *Skidmore*, rather than *Seminole Rock*, illuminates the better course for resolving the meaning of ambiguous administrative rules and the course that this Court will follow in establishing the law of West Virginia. Significantly, in *Appalachian Power*, this Court addressed the issue of the appropriate analysis for reviewing an agency's construction of its own interpretive rules,[3] and expressly adopted the *Skidmore* standard. *See* 195 W.Va. at 583, 466 S.E.2d at 434. I discern no basis for affording *Chevron* deference to an agency's informal interpretation of its own regulations, where we have otherwise refused to do so in the case of formal interpretive rules promulgated pursuant to the notice-and-comment provisions of *W.Va.Code*, 29A–3–8 (1985) (1998 Repl.Vol.). Indeed, to do so would run afoul of the spirit, if not the letter, of the Legislature's admonition that such interpretive rules should not be given controlling weight unless they are issued pursuant to a legislative grant of discretion:

> An interpretive rule may not be relied upon to impose a civil or criminal sanction nor to regulate private conduct or the exercise of private rights or privileges nor to confer any right or privilege provided by law and is not admissible in any administrative or judicial proceeding for such purpose, except where the interpretive rule established the conditions for the exercise of discretionary power as herein provided.

*W.Va.Code*, § 29A–1–2(c).

Thus, in the absence of statutory or other principles that prescribe a different standard of review, judicial review of an administrative agency's interpretation of its own legislative rule should be governed by the standard set forth in *Skidmore.* The agency's construction, while not controlling upon the courts, nevertheless constitutes a body of experience and informed judgment to which a reviewing court should properly resort for guidance. The weight that must be accorded an administrative judgment in a particular case will depend upon (1) the thoroughness evident in its consideration, (2) the validity of its rea-

---

**3.** As we stated in *Appalachian Power*, "[i]nterpretive rules ... do not create rights but merely clarify an existing statute or regulation." 195 W.Va. at 583, 466 S.E.2d at 434; *see also W.Va.* Code, 29A–1–2(c) (1982) (1998 Repl.Vol.) (defining an "interpretive rule" for purposes of West Virginia Administrative Procedures Act).

soning, (3) its consistency with earlier and later pronouncements, and (4) all those factors which give it power to persuade, if lacking power to control. As we observed in *Appalachian Power*, under *Skidmore* and its analogues,

> an interpretive rule is entitled to some deference, but it is not to be given the full *Chevron* deference that applies to "legislative" rules. We are obligated to give appropriate consideration to all agency interpretations (which many of our cases have referred to as deference). Then we must decide how much *weight* the interpretation should receive. To say that we give it "no deference" implies that we do not even consider the interpretation, which is not the case. We refuse to become a "rubber stamp" for an agency's action. But, it is more accurate to say that interpretive rules are not to be given controlling weight than it is to say that they would be given no deference. There is, indeed, a great danger in giving *Chevron* deference (and often legislative effect) to rules promulgated without the benefit of legislative oversight.

195 W.Va. at 583 n. 7, 466 S.E.2d at 434 n. 7 (emphasis in original).

Accordingly, I concur in the majority opinion.