IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

**FILED**

**June 5, 2019**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 18-0121

DALE W. STEAGER, WEST VIRGINIA STATE TAX COMMISSIONER,

Respondent Below/Petitioner

v.

CONSOL ENERGY, INC., d/b/a CNX GAS COMPANY LLC,

Petitioner Below/Respondent

Appeal from the Circuit Court of Lewis County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 17-C-11

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

AND

No. 18-0122

DALE W. STEAGER, WEST VIRGINIA STATE TAX COMMISSIONER,

Respondent Below/Petitioner

v.

CONSOL ENERGY, INC., d/b/a CNX GAS COMPANY LLC,

Petitioner Below/Respondent

Appeal from the Circuit Court of McDowell County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 16-C-135

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

AND

No. 18-0123

DALE W. STEAGER, WEST VIRGINIA STATE TAX COMMISSIONER
and DAVID E. SPONAUGLE, ASSESSOR OF DODDRIDGE COUNTY,

Respondents Below/Petitioners

v.

CONSOL ENERGY, INC., d/b/a CNX GAS COMPANY LLC,

Petitioner Below/Respondent

Appeal from the Circuit Court of Doddridge County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 17-AA-2

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

AND

No. 18-0124

DALE W. STEAGER, WEST VIRGINIA STATE TAX COMMISSIONER and
ARLENE MOSSOR, ASSESSOR OF RITCHIE COUNTY,

Respondents Below/Petitioners

v.

ANTERO RESOURCES CORPORATION,

Petitioner Below/Respondent

Appeal from the Circuit Court of Ritchie County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 17-AA-1

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

AND

No. 18-0125

DALE W. STEAGER, WEST VIRGINIA STATE TAX COMMISSIONER and
DAVID E. SPONAUGLE, ASSESSOR OF DODDRIDGE COUNTY,

Respondents Below/Petitioners

v.

ANTERO RESOURCES CORPORATION,

Petitioner Below/Respondent

Appeal from the Circuit Court of Doddridge County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 17-AA-1 and 17-AA-3

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

AND

No. 18-0227

THE COUNTY COMMISSION OF DODDRIDGE COUNTY, Sitting as the Board of
Assessment Appeals and Board of Equalization,

Respondent Below/Petitioner

v.

CONSOL ENERGY, INC., d/b/a CNX GAS COMPANY LLC,

Petitioner Below/Respondent

Appeal from the Circuit Court of Doddridge County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 17-AA-2

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

AND

No. 18-0228

THE COUNTY COMMISSION OF DODDRIDGE COUNTY, Sitting as the Board of
Assessment Appeals and Board of Equalization,

Respondent Below/Petitioner

v.

ANTERO RESOURCES CORPORATION,

Petitioner Below/Respondent

Appeal from the Circuit Court of Doddridge County, Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. 17-AA-1 and 17-AA-3

Submitted:  March 12, 2019
Filed: June 5, 2019

Patrick Morrisey
Attorney General
L. Wayne Williams, Esq.
Assistant Attorney General
Charleston, WV
Counsel for Petitioner Dale W. Steager,
West Virginia State Tax Commissioner


Jonathan Nicol, Esq.
Brandy D. Bell, Esq.
Lindsay M. Gainer, Esq.
Kay Casto & Chaney PLLC
Charleston, WV
Counsel for Respondent the County Commission
of Doddridge County

James Brian Shockley, Esq.
Assistant Prosecuting Attorney
Harrison County Prosecutor's Office
Clarksburg, WV
Counsel for Amicus Curiae the Harrison
County Commission and Joseph R. Romano,
Assessor of Harrison County

Jack C. McClung, Esq.
Charleston, WV
Counsel for Amicus Curiae West Virginia
Association of County Officials, Inc.

Kelli D. Talbott, Esq.
Senior Deputy Attorney General
Charleston, WV
Counsel for Amicus Curiae Steven L. Paine,
West Virginia State Superintendent of Schools

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, WV
Craig A. Griffith, Esq
John J. Meadows, Esq.
Steptoe & Johnson PLLC
Charleston, WV
Counsel for Respondents
Consol Energy Inc. d/b/a CNX Gas
Company LLC and Antero
Resources Corporation

Timothy E. Haught, Esq.
Wetzel County Prosecuting Attorney
New Martinsville, WV
Counsel for Amicus Curiae the County
Commission of Wetzel County, West Virginia

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "As a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct. Thus, a tax assessment of coal property will be presumed to be correct when the assessor, in assessing the coal property: (1) relies upon the legislative rules prescribing the methods by which property is to be assessed; and (2) uses, as a guide, information furnished by the tax department, such as a list of comparable sales of similar property. The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous." Syl. Pt. 2, *W. Pocahontas Properties, Ltd. v. Cty. Comm'n of Wetzel Cty.*, 189 W. Va. 322, 431 S.E.2d 661 (1993).

2.      "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

3.      "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R. M. v. Charlie A. L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

4.      "A regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, *W. Va. Code*, 29A–1–2(d) [1982], and such a legislative rule has the force and effect of law."

Syl. Pt. 5, *Smith v. W. Va. Human Rights Comm'n*, 216 W. Va. 2, 4, 602 S.E.2d 445, 447 (2004).

5.      "A statute, or an administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten."   Syl. Pt. 1, *Consumer Advocate Div. of Pub. Serv. Comm'n of W. Va. v. Pub. Serv. Comm'n of W. Va*., 182 W. Va. 152, 154, 386 S.E.2d 650, 652 (1989).

6.      "If the language of an enactment is clear and within the constitutional authority of the law-making body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery. Even when there is conflict between the legislative rule and the initial statute, that conflict will be resolved using ordinary canons of interpretation."   Syl. Pt. 3, in part, *W. Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp*., 196 W. Va. 326, 472 S.E.2d 411 (1996).

7.      """"Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally. Where such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause." Syllabus Point 7, [as modified,] *Atchinson v. Erwin*, [172] W.Va. [8], 302 S.E.2d 78 (1983).' Syllabus

Point 4, as modified, *Hartsock-Flesher Candy Co. v. Wheeling Wholesale Grocery Co*., 174 W.Va. 538, 328 S.E.2d 144 (1984)." Syl. Pt. 4, *Gibson v. W. Virginia Dep't of Highways,* 185 W. Va. 214, 406 S.E.2d 440 (1991), *holding modified by Neal v. Marion*, 222 W. Va. 380, 664 S.E.2d 721 (2008).

8.      West Virginia Code of State Rules § 110-1J-4.3 (2005) does not permit the imposition of a "not to exceed" limitation on the operating expense deduction authorized thereunder and use of such limitation along with a percentage deduction violates the "equal and uniform" requirement of West Virginia Constitution Article X, Section 1, as well as the equal protection provisions of the West Virginia and United States Constitutions.

9.      "Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference.   In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No

deference is due the agency's interpretation at this stage." Syl. Pt. 3, *Appalachian Power Co. v. State Tax Dep't of W. Virginia*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

10. "If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va. Code, 29A–4–2 (1982)." Syl. Pt. 4, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

11. "Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syl. Pt. 4, *State v. Gen. Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959).

12. The provisions contained in West Virginia Code of State Rules §§ 110-1J-4.1 and 110-1J-4.3 (2005) for a deduction of the average annual industry operating expense requires the use of a singular monetary average deduction.

WORKMAN, Justice:

These are seven consolidated appeals from the business court's January 17, 2018 and February 7, 2018, orders reversing various Boards of Assessment Appeals and rejecting the West Virginia State Tax Department's valuation of respondents' gas wells for *ad valorem* tax purposes. The business court concluded that the Tax Department's valuation violated the applicable regulation by improperly imposing a "cap" on the amount of operating expenses which may be deducted and was likewise in violation of West Virginia Constitution Article X, Section 1's "equal and uniform" provision and the equal protection provisions of the United States and West Virginia Constitutions. The business court further concluded that a survey utilized to ascertain the average industry operating expenses for Marcellus shale wells failed to properly permit itemization of "post-production" expenses for inclusion in the calculation of the operating expense average. Following entry of these orders, the business court subsequently declined to alter or amend its judgment upon motion of the Doddridge County Commission.

Upon careful review of the briefs of the parties and amici curiae,[1] the appendix record, the arguments of the parties, and the applicable legal authority, we agree

---

[1] Amici curiae Harrison County Commission, Joseph R. Romano, Assessor of Harrison County, The West Virginia Association of County Officials, Inc., Steven L. Paine, West Virginia State Superintendent of Schools, and the County Commission of Wetzel County, West Virginia, likewise submitted briefs in support of the Tax Department's position. The Court acknowledges and expresses its appreciation for the amici curiae's submissions.

1

with the business court's conclusion that the Tax Department acted in violation of the applicable regulations by improperly imposing a cap on respondents' operating expense deductions and therefore affirm its decision to that extent. However, we find that the business court erred in rejecting the Tax Department's interpretation of the applicable regulations concerning the inclusion of post-production expenses in the calculation of the annual industry average operating expenses. We likewise find that the business court erred in crafting relief which permitted an unlimited percentage deduction for operating expenses in lieu of a monetary average, and therefore reverse that aspect of the business court's decision and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Respondents Consol Energy, Inc. d/b/a CNX Gas Company, LLC ("CNX") and Antero Resources Corporation ("Antero") (collectively "respondents") are owners of various gas wells in Doddridge, Ritchie, Lewis, and McDowell Counties; CNX owns conventional, vertical gas wells and Antero owns horizontal, Marcellus shale gas wells ("Marcellus wells"). These gas well interests are appraised for *ad valorem* tax purposes by petitioner Dale W. Steager, West Virginia State Tax Commissioner ("Tax Department"), and assessed by the respective county commissions. This case involves valuation of CNX's conventional gas wells for the 2016 tax year and Antero's Marcellus wells for both the 2016 and 2017 tax years.

GAS WELL VALUATION AND DEDUCTION OF OPERATING EXPENSES

To determine the value of gas wells for *ad valorem* taxation purposes, gas well owners provide gross receipts from their well production, to which the Tax Department applies a "production decline rate." From this figure, the "average annual industry operating expenses" are deducted to establish a "net receipts" value. That value is then capitalized to determine the taxable value. This formula is described in West Virginia Code of State Rules § 110-1J-4.1 (2005) as follows:

> 4.1. General. -- Oil and/or natural gas producing property value shall be determined through the process of applying a yield capitalization model to the net receipts (*gross receipts* less royalties paid *less operating expenses*) for the working interest and a yield capitalization model applied to the gross royalty payments for the royalty interest.

(emphasis added). With respect to the operating expenses referenced above, West Virginia Code of State Rules § 110-1J-4.3 provides that the Tax Commissioner shall "every five (5) years, determine the average annual industry operating expenses per well. The average annual industry operating expenses shall be deducted from working interest gross receipts to develop an income stream for application of a yield capitalization procedure." (emphasis added).

Each tax year, the Tax Department issues an Administrative Notice which states what the average annual industry operating expense is for that tax year; it is expressed by way of a percentage of the well's gross receipts, with a "not to exceed" amount or, as

3

respondents have characterized it, a "cap."[2]  For the tax year 2016, Administrative Notice 2016-08 provided that for conventional gas wells the "[d]irect ordinary operating expenses will be estimated to be 30% of the gross receipts derived from gas production, not to exceed $5,000 . . . ." (emphasis added).  For Marcellus horizontal wells, the Administrative Notice provided that "the maximum operating expenses allowed is 20% of the gross receipts derived from gas production, not to exceed $150,000."   For the tax year 2017, the Administrative Notice provided for operating expenses of 20% not to exceed $175,000 for Marcellus wells.[3]

Respondents appealed their gas well valuations to the respective Boards of Assessment Appeals ("Board(s)") for the appropriate county, claiming that their actual expenses[4] were in excess of the stated percentages and that the cap resulted in an artificial reduction in the operating expense deduction where their expenses exceeded the cap.[5]

_____

[2] The Tax Department disputes the characterization of the "not to exceed" amount as being tantamount to a "cap."   As discussed more fully *infra*, we find the Tax Department's resistance to that characterization unfounded.

[3] Valuations for the conventional wells for tax year 2017 are not at issue herein; however, in that instance, the operating expense percentage was increased from 30% to 45%, but the $5,000 limit remained.

[4] CNX asserted that its actual expenses were 37% of its gross receipts; Antero maintained that its actual expenses were 23% for tax year 2016 and 36% for tax year 2017, respectively.

[5] For example, if a well's gross receipts were $10,000, the 30% operating expense reduction would equal $3,000.00 and it would get the benefit of the full 30%.  However, if gross receipts were greater—for example $50,000.00—application of the cap would serve

4

Respondents provided expert testimony in support of these figures and analysis of the inequality occasioned by the cap.[6] These experts also testified that industry-reported operating expense percentages[7] were closer to respondents' actual values than the Tax Department's average percentage. The experts further noted that in tax years preceding the 2016 tax year, the Administrative Notice invited taxpayers to submit their actual expenses and that, despite no change in the law, the 2016 and subsequent Administrative Notices did not make such an invitation.

In response, the Tax Department offered testimony from its appraiser Cynthia Hoover who explained that the average operating expense figures were derived from a survey of gas well producers conducted in 2014. She explained that, based on the results of that survey for conventional gas wells, on average each well incurred expenses of $5,000.00. This monetary amount approximated, on average, 30% of the gross receipts per well. Notably, she agreed that application of the $5,000.00 "not to exceed" amount served to treat higher-producing wells differently than lower-producing wells and that the cap resulted in certain wells with higher gross receipts not realizing a full 30% operating expense deduction. Ms. Hoover agreed that the Tax Department had previously invited

to provide less than a 30% reduction (*i.e.*, the $5,000 cap equates to only a 10% operating expense deduction on a well with $50,000 in gross receipts).

[6] It appears that the majority of wells in each county, except McDowell, were subject to the cap.

[7] The West Virginia Oil and Natural Gas Association provided a letter indicating that its members' average operating expense was 41% of gross receipts.

5

production of "actual expenses," but demurred that the regulation actually does not allow for any such consideration since it requires use of the "average industry" expenses.

With respect to the Marcellus wells, respondents' experts further explained that the survey circulated to ascertain the average industry operating expense did not provide line items for expenses such as gathering, compressing, processing, and transporting, which expenses are incurred in getting shale gas and its products to market. Consequently, these expenses—which are significant for Marcellus wells—are not factored into the average industry operating expenses. The experts explained that requiring the taxpayers to report their gross receipts at the "field line point of sale,"[8] where the Marcellus gas yields a higher price, without including those commensurate expenses in the average industry expense calculation, was inequitable and resulted in overvaluation of their gas wells.

The Tax Department countered that West Virginia Code of State Rules § 110-1J-3.16 (2005) provides that "operating expenses" include only "ordinary expenses which are directly related to the *maintenance* and *production* of natural gas and/or oil" and does not include "extraordinary expenses." (emphasis added). The Tax Department took the position that expenses for gathering, processing, and transporting are essentially "post-

---

[8] West Virginia Code of State Rules § 110-1J-3.8 provides that "'[g]ross receipts' means total income received from production on any well, *at the field line point of sale*, during a calendar year before subtraction of any royalties and/or expenses." (emphasis added).

production" expenses unrelated to getting the gas out of the ground and therefore not "directly related" to the "maintenance and production" of gas, as required by the Rule. The Tax Department agreed that the survey utilized was one designed prior to the advent of Marcellus drilling in the State, but also that those particular expenses would not be properly deductible regardless.[9]

PROCEDURAL HISTORY AND BUSINESS COURT RULING

The various Boards upheld the Tax Department's valuations and respondents appealed those decisions to circuit court. The matters were then referred to the business court. Based on the records created before the various Boards and after briefing by the parties, the business court concluded that the Tax Department failed to assess the wells at their true and actual value.

In particular, the business court found that use of the "not to exceed" amount or "cap" was not supported by West Virginia Code of State Rules § 110-1J-4.3 and that, in effect, the Tax Department was using two averages—the percentage *and* the cap—depending on the amount of gross receipts for a particular well. That is to say, if a well's gross receipts resulted in its expenses meeting or exceeding the cap, the monetary cap was utilized; if the gross receipts resulted in the expenses being less than the cap, the percentage

---

[9] The Tax Department also suggested (somewhat inconsistently), however, that the survey participants could have included those expenses under the "other" line item category.

deduction was utilized. The business court therefore found that the cap "singles out" wells with higher gross receipts, applying a different percentage reduction for operating expenses by way of the cap. The business court found that this application of the rule was a violation of the constitutional "equal and uniform" requirement and equal protection.

With respect to the Marcellus wells, the business court also found, in addition to the impermissible cap, that the Tax Department's method of calculating the average industry expense was under-inclusive of operating expenses and therefore overvalued the wells. The business court found that the survey utilized to determine this figure pertained "almost solely to typical lease operating expenses . . . for conventional wells." Given that the survey did not include line items for gathering, compressing, processing, and transporting expenses, the business court declared it to be "outdated and misdesigned," and concluded that those expenses were "directly related to maintenance and production" of natural gas. With respect to the conclusion that such expenses were related to "maintenance and production," the business court found simply that because the rules require calculation of gross receipts based on the "point of sale," the Tax Department must allow for operating expenses incurred to reach that point of sale and the resultant increased value.[10]

---

[10] The business court cited to the Tax Department's characterization of some of these expenses as being for the purpose of "processing wet gas to remove natural gas," concluding that this process was obviously related to "production" of natural gas. The

8

Based upon the foregoing conclusions, for the conventional wells, the business court found the record inadequate to set a value and remanded to the Board "to set the fair value . . . based on application of the Tax Department's 30% average annual industry operating expense percentage . . . without the imposition of a cap." With respect to the Marcellus wells, however, the business court declared the fair value of the wells using evidence in the record, and set the taxable value at a sum certain "based on application of the State's 20% average annual industry operating expense percentage by Antero's gross receipts without the imposition of a cap."[11]

Following entry of the business court's orders, petitioner Doddridge County Commission ("Doddridge County") moved to alter or amend the judgment, arguing that its failure to file a responsive brief before entry of the orders was due to its attorney being

---

business court further found that the taxpayers' failure to include those expenses under the "other" category on its survey responses did not alleviate the infirmity in the survey.

[11] For reasons that do not plainly appear from the record, the business court's relief utilized the same 20% expense figure derived from the survey which it had found infirm due to lack of inclusion of post-production costs. The business court's order makes reference to an across-the-board unlimited 20% expense reduction as representing a "compromise" amount requested by Antero. However, it is not clear whether such compromise amount purported to correct only the alleged discrepancy between Antero's actual expense percentages, the imposition of the cap, the lack of inclusion of post-production expenses, or all of these challenged calculations. Regardless, despite agreeing with respondent's contention that the survey numbers were fatally flawed, the business court used those same figures to render its judgment—it merely removed the cap. *See infra.*

9

arrested and indicted shortly after the briefing deadline.[12] As such, Doddridge County argued it was deprived of its opportunity to represent its interests. The business court denied the motion, finding primarily that most of the county commissions relied upon the Tax Department to file briefs on the issue and therefore declined to file briefs. It found that the Tax Department and county commissions' interests were fully aligned and therefore adequately protected. These appeals followed and were consolidated before this Court for consideration.

## II. STANDARD OF REVIEW

While "[a]s a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct," this case requires the Court to analyze the Tax Department's interpretation and application of a legislatively-approved regulation. Syl. Pt. 2, in part, *Western Pocahontas Props., Ltd. v. Cty. Comm'n of Wetzel Cty.*, 189 W.Va. 322, 431 S.E.2d 661 (1993). "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W.Va. 573, 466 S.E.2d 424 (1995). Moreover, this case presents additional issues of law by way of the constitutional challenges: "Where the issue on an appeal from the circuit court is clearly a question of law . . . we apply a *de*

---

[12] The county commission's brief was due by December 4, 2017. The Tax Department and Assessor filed its brief on that date, but the county commission filed no brief. Steven Sluss, the Doddridge County Commission's lawyer, was arrested four days after the briefing due date on December 8, 2017 and the Office of Disciplinary Counsel moved for immediate suspension of his law license on December 13, 2017.

*novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).  Accordingly, our review is plenary.

### III.  DISCUSSION

The Tax Department asserts that the business court erred in 1) finding that its imposition of the "cap" was a misapplication of the legislative rule; 2) finding that the survey and resultant calculation of average operating expenses should have included post-production expenses; and 3) permitting, as its relief, use of an unlimited percentage operating expense deduction.  It urges reversal of the business court and return to the original valuations.  Doddridge County, however, while likewise arguing that the business court should be reversed with a return to the original valuation, takes the position that if the business court is upheld, the proper methodology for deduction of operating expenses is the use of a monetary average rather than a percentage.  Our discussion, then, must necessarily address both the validity of the business court's legal conclusions, as well as the propriety of the remedy which it afforded.

At the outset of our discussion, we would be remiss in failing to note that this is the second instance within this Court term in which we have been called upon to assess the legal and constitutional implications of the Tax Department's application of regulations affecting the valuation of natural resources property.  In *Murray Energy v. Steager*, No. 18-0018, 2019 WL 1982993 (W. Va. Apr. 29, 2019), petitioners challenged the coal property valuation regulations, arguing that the methodology as delineated therein for

11

calculating the average steam coal price per ton and average seam thickness violated constitutional equality provisions. We disagreed and held that the legislatively-approved methodology rationally flowed from its enabling statute and the Tax Department was therefore entitled to the deference afforded administrative agencies under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), in utilizing the methodology.

Importantly, petitioners in *Murray Energy* did not accuse the Tax Department of "misapplying the methodology, not evenly applying the methodology to all coal property taxpayers, or violating the regulations in any way." *Id*. at *7. In contrast, respondents herein argue that the Tax Department misinterpreted and/or misapplied the plain language of the regulations, creating a method of operating expense calculation which unconstitutionally differentiates between taxpayers and otherwise overvalues their gas interests. The respondents herein take no issue with the regulation as crafted, but rather the manner in which the Tax Department has chosen to interpret and implement it.

A.     INTERPRETATION AND APPLICATION OF THE LEGISLATIVE RULE

West Virginia Constitution Article X, Section 1 provides that "taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law." West Virginia Code § 11-6K-1 (2010) provides that "[a]ll industrial property and natural resources property shall be assessed annually as of the assessment date at sixty percent of its true and

actual value[]"; moreover, West Virginia Code § 11-1C-10(e) (1994) directs the Tax Commissioner to "develop a plan for the . . . valuation of natural resources property." *See also* W. Va. Code § 11-6K-8 (2010) ("The Tax Commissioner is hereby authorized to promulgate . . . rules . . . as necessary or convenient for administration and interpretation of this article."). Accordingly, the Tax Commissioner promulgated regulations for the valuation of oil and natural gas properties, which have the force and effect of law due to their legislative approval. *See* Syl. Pt. 5, *Smith v. W. Va. Human Rights Comm'n*, 216 W. Va. 2, 602 S.E.2d 445 (2004) ("A regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' . . . [and] has the force and effect of law.").

As explained above, West Virginia Code of State Rules § 110-1J-4.1 provides that the value of natural gas producing property is determined, in part, by applying a yield capitalization model to the "net receipts" which are parenthetically defined as "gross receipts less royalties paid less operating expenses[.]" West Virginia Code of State Rules § 110-1J-4.3, approved in 2005, provides further instruction regarding the deduction of operating expenses to calculate net receipts:

> 4.3. Average industry operating expenses. -- The Tax Commissioner shall every five (5) years, determine the average annual industry operating expenses per well. The *average annual industry operating expenses shall be deducted from working interest gross receipts* to develop an income stream for application of a yield capitalization procedure.

(emphasis added).[13]  In that regard, Administrative Notice 2016-08 entitled "State Tax Commissioner's Statement for the Determination of Oil and Gas Operating Expenses for Property Tax Purposes for Tax Year 2016, Pursuant to § 110 CSR 1J-4.3" states:

> Direct ordinary operating expense will be estimated to be 30% of the gross receipts derived from gas production, *not to exceed $5,000* . . . . [and] [f]or Marcellus horizontal wells the maximum operating expenses allowed is 20% of the gross receipts derived from gas production, *not to exceed $150,000.*"[14]

(footnote added).  The business court found that the Tax Department's method of utilizing a percentage deduction with a "not to exceed" amount (or "cap") is in clear violation of the West Virginia Code of State Rules § 110-1J-4.3, which makes no provision for such limitation.  The business court concluded that by applying a percentage deduction to lower-producing gas wells, but enforcing a cap on higher-producing gas wells, the Tax

---

[13] The Tax Department dedicates much of its briefing arguing that respondents are not permitted to deduct their *actual* expenses.  This is correct, but also fairly irrelevant for our purposes.  CNX introduced evidence below of what their actual expenses were for purposes of demonstrating the disparity between their actual expenses and the permitted deductions; it may well maintain, in some measure, that actual expenses are required. However, the business court did not permit deduction of actual expenses, nor do respondents before this Court argue they are entitled to their actual expenses.  In its brief, CNX concedes that the business court's relief "reflects the 'mass appraisal' system of valuation contemplated by [the Rules] and will agree with the fair market value that results from application of the average annual industry operating expense percentage to Respondent's gross receipts without the imposition of a cap[.]"

[14] For ease of discussion, only the conventional gas well percentage and "cap" figures are used in our analysis.  The factual and legal analysis of the percentages and cap applicable to the Marcellus wells, for each tax year appealed, is the same.

14

Department is creating two categories of gas wells and permitting unequal operating expense deductions.

The Tax Department relies on the testimony of Ms. Hoover to explain that its use of both a percentage figure and monetary "not to exceed" amount is a permissible construction and implementation of the regulation. The Tax Department cites Ms. Hoover's explanation that the Notice provides for a deduction of 30%, which is the *percentage* average amount of expenses, in an amount not to exceed $5,000, which is the *monetary* average. In this way, the Tax Department insists that the "not to exceed" amount is simply the monetary representation of the percentage average operating expense and therefore ensures that no taxpayer deducts greater than the average expense. As to the characterization of the "not to exceed" amount as a "cap," the Tax Department ardently rejects this description, insisting that the percentage deduction and the "not to exceed" amount are simply two different ways of expressing the same thing. The Tax Department repeatedly correlates the relationship between these figures to that of equivalent measurements, stating that "12 inches equals one foot." Accordingly, the Tax Department argues it is not acting in contravention of the Rule, nor is it imposing an impermissible "cap."

It is well-established that "[a] statute, or an administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten." Syl. Pt. 1, *Consumer Advocate Div. of Pub. Serv. Comm'n of W. Va. v. Pub. Serv. Comm'n of W.*

15

*Va.*, 182 W. Va. 152, 386 S.E.2d 650 (1989).  Rather, [i]f the language of an enactment is clear and within the constitutional authority of the law-making body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery."  Syl. Pt. 3, in part, *W. Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp.*, 196 W. Va. 326, 472 S.E.2d 411 (1996).

There is little question that West Virginia Code of State Rules § 110-1J-4.1 and § 110-1J-4.3 make no provision for an upper limit on the amount of the annual operating expense deduction which may be taken.  Its language plainly and unambiguously requires and permits only a simple deduction of the "average annual industry operating expenses . . . from working interest gross receipts[.]"[15]  Moreover, the Rule provides no discretion for the Tax Department to employ its own methodology for expression and application of the annual industry average expense deduction.  It is therefore clear that the Tax Department's use of a percentage deduction limited by the use of a "not to exceed" amount or "cap" is neither authorized by nor consistent with the regulation.

Further, we wholly reject the Tax Department's insistence that the "cap" and percentage are merely two expressions of "the same" average figure.  This aspect of the

---

[15] Moreover, the fact that the Tax Department has long-utilized the "not to exceed" amount in its Administrative Notices is of no moment for our purposes:  "'While long standing interpretation of its own rules by an administrative body is ordinarily afforded much weight, such interpretation is impermissible where the language is clear and unambiguous.' Syl. pt. 3, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970)." Syl. Pt. 1, *Ooten v. Faerber*, 181 W. Va. 592, 383 S.E.2d 774 (1989).

case presents less of an issue of law than logic. Obviously, using a percentage operating expense deduction creates a variable number—variable depending on the amount of the gross receipts to which it is applied. The static "cap" is not variable and therefore does not maintain a pro rata relationship to the gross receipts as the percentage does. They are, mathematically, not "the same." In addition to being logically inscrutable, the Tax Department's position that the percentage and monetary cap are the same is undermined by the fact that in 2017, it increased the percentage deduction allowable for conventional wells from 30% to 45% based on a drop in gas prices, but kept the same cap. For Marcellus wells, it increased the cap from $150,000 to $175,000, but kept the same percentage deduction. Clearly then, the percentage and monetary average are not "the same," nor do they even move in lockstep.

Moreover, given the regulation's clarity, our analysis of this aspect of the case is unaffected by generalized claims of agency deference. As explained in *Cookman Realty Group, Inc. v. Taylor*, 211 W. Va. 407, 411, 566 S.E.2d 294, 298 (2002):

> We need not go so far in this case as to define what deference, if any, must be afforded an administrative agency's interpretation of its own legislative rule, since the regulations at issue here [are] unambiguous[] . . . . A reviewing court would only be required to afford deference to an agency's interpretation if the regulation contained an ambiguity.

Rather, "[t]he rule[s] of construction . . . [apply] only when the Legislature has blown an uncertain trumpet. If ambiguity or silence does not loom, the occasion for preferential

17

interpretation never arises." *W. Va. Health Care Cost Review Auth.*, 196 W. Va. at 337, 472 S.E.2d at 422.

The business court correctly found that where the cap is imposed, that gas well's effective percentage operating expense is reduced to less than 30%. The Tax Department's position fails to recognize that by using a percentage deduction on smaller producing wells, thereby resulting in a deduction less than $5,000, it is in the same measure *disallowing* the same average it claims to be *enforcing* as to the larger-producing wells. It seems clear that the percentage is utilized to allow the Tax Department to eke out taxes on low-producing wells, whereas if the monetary average were used, low-producing wells may have zero taxable value, *i.e.* a well whose gross receipts are $5,000 or less. Use of an "average" by definition results in an evening out of the losses and gains realized at the far ends of the spectrum, which in this case are occupied by lower- and higher-producing wells. The Tax Department's use of a percentage and cap serves to alter its operating expense formula depending on which end of the spectrum a well is on, thereby treating like wells in a dissimilar fashion.

It is therefore fairly inarguable that this errant interpretation and application of the regulations necessarily creates an inequality under both the "equal and uniform"

language of Article X, Section 1,[16] and the equal protection provisions of the West Virginia and United States Constitutions.[17]  This is not due to an over-valuation of the gas wells *per se*, but rather the use of two differing formulas to calculate operating expenses, which results in some wells receiving the full benefit of the deduction and others being denied it. Indeed, the Tax Department's use of an unauthorized operating expense deduction method which creates inconsistent deductions between like properties, is precisely the type of agency action which this Court cautioned against in *Murray Energy*.  *See* 2019 WL 1982993, at *13 (distinguishing "alleged valuation inequalities which necessarily result from carefully crafted, stakeholder-involved, and legislatively-approved systems" from those which make "facially arbitrary classifications" or "allow for use of indiscriminate applications"); *cf. Appalachian Power Co.*, 195 W. Va. at 596, 466 S.E.2d at 447 (finding

---

[16] "Our equal and uniform provision governing taxes is sub-species of the equal protection clause." *Kline v. McCloud*, 174 W. Va. 369, 380, 326 S.E.2d 715, 726 (1984) (Neely, J., dissenting).

[17] As explained in *Murray Energy*,

> "The right to equal protection of the laws is, of course, found in the Fourteenth Amendment to the Constitution of the United States." *Payne v. Gundy*, 196 W. Va. 82, 87, 468 S.E.2d 335, 340 (1996).  Commensurately, "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution."  Syl. Pt. 4, *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989).

2019 WL 1982993, at *12.

no equal protection violation where regulation "treats all businesses within each class the same").

Finally, in contrast to *Murray Energy*, the inequality occasioned by the economic classifications created by the Tax Department's interpretation and application of West Virginia Code of State Rules § 110-1J-4.3 fails to pass the "rational relationship" test. As this Court has held, "[w]here economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally." Syl. Pt. 4, in part, *Gibson v. W. Va. Dep't of Highways*, 185 W. Va. 214, 406 S.E.2d 440 (1991), *holding modified by Neal v. Marion*, 222 W. Va. 380, 664 S.E.2d 721 (2008); *see also Appalachian Power,* 195 W. Va. at 594, 466 S.E.2d at 445 (using rational relationship test to assess constitutionality of tax regulations). In this instance, the Tax Department offers no governmental purpose for its use of a methodology which provides differing operating expense percentage deductions depending on the amount of gross receipts, nor can this Court discern one.[18] In fact, the Tax Department adamantly refuses to admit that any such classifications are created by its methodology, much less that they are rational ones.

---

[18] As respondents note, the Tax Department cursorily mentions that the "not to exceed" amount serves as a "safeguard," but fails to indicate against what occurrence it safeguards.

20

We therefore hold that West Virginia Code of State Rules § 110-1J-4.3 does not permit the imposition of a "not to exceed" limitation on the operating expense deduction authorized thereunder and use of such limitation along with a percentage deduction violates the "equal and uniform" requirement of West Virginia Constitution Article X, Section 1, as well as the equal protection provisions of the West Virginia and United States Constitutions. We therefore affirm the business court's orders to that extent.

B.    LACK OF INCLUSION OF GATHERING, PROCESSING, AND TRANSPORTING
      EXPENSES

As previously indicated, with regard to the Marcellus wells, the business court made an additional finding that the operating expense average calculated by the Tax Department was flawed because it did not include expenses for gathering, compressing, processing, and transporting the gas to market, which the Tax Department characterizes as "post-production" expenses. In that regard, West Virginia Code of State Rules § 110-1J-3.16, defines "operating expenses" as

> only those ordinary expenses which are *directly related to the maintenance and production of natural gas and/or oil.* These expenses do not include extraordinary expenses, depreciation, ad valorem taxes, capital expenditures or expenditures relating to vehicles or other tangible personal property not permanently used in the production of natural gas or oil.

(emphasis added). The Tax Department maintains the business court erred because gathering, compressing, processing, and transporting expenses are not related to getting the gas out of the ground, but are related solely to getting the gas to the buyer; therefore, they

21

do not "directly relate" to "maintenance and production" of gas as required by Rule 4.1 and are not properly included in their average industry expense calculation.

Antero responds that since its gross receipts must be calculated at the "field line point of sale" by regulation, a commensurate inclusion of the expenses incurred to reach the field line point of sale is necessary. Antero further argues that the definition of "gross receipts" supports their argument. "[G]ross receipts" are defined as "total income received from *production* on any well, at the field line point of sale, during a calendar year before subtraction of any royalties and/or expenses." W. Va. C.S.R. § 110-1J-3.8 (emphasis added). Accordingly, Antero argues that if the gross receipts are the result of "production," any expenses incurred to that point are necessarily also part of "production" and properly included in the average expense calculation.

The Tax Department counters that deductions are a matter of "legislative grace" as recognized by the Court in *Shawnee Bank v. Paige*, 200 W. Va. 20, 27, 488 S.E.2d 20, 27 (1997). Therefore, such expense deductions need not necessarily fairly correlate to gross receipts inasmuch as the deduction is not required in the first instance.

Critically, in terms of the definition of "maintenance and production," Antero concedes that the Rule is silent. Therefore, unlike the Tax Department's errant interpretation and application of an unambiguous regulation as indicated above, the ambiguity surrounding what expenses qualify as being "directly related to the maintenance

and production" of natural gas necessitates the *Chevron* analysis utilized in *Murray Energy.*

"In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984)." Syl. Pt. 3, in part, *Appalachian Power*, 195 W. Va. 573, 466 S.E.2d 424.

As the *Appalachian Power* Court explained, "[j]udicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference." Syl. Pt. 3, in part. First, if

> the Legislature has directly spoken to the precise question at issue [and] . . . the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage.

*Id.* In other words, "[i]f the legislative rule is valid, clear as to its intent and not contrary to the legislative enactment that triggered its promulgation, the need for further review does not arise." *Id.* at 586, 466 S.E.2d at 437.

There seems to be little question that the Legislature has not, in its enabling statute, spoken to the issue of whether a Marcellus well average operating expense calculation must necessarily include gathering, compressing, processing, and transporting or "post-production" expenses. West Virginia Code § 11-6K-1 requires only that natural resources properties be assessed at their "true and actual" value. As we concluded in

23

*Murray Energy*, the statute provides no methodology for making that determination and expressly delegates that authority to the Tax Commissioner. 2019 WL 1982993, at \*10.

Moreover, the legislative rules likewise do not specify whether expenses "directly related to the maintenance and production of natural gas" include expenses which are incurred from the time the gas is extracted from the ground but before the gas reaches the buyer. West Virginia Code of State Rules § 110-1J-3.16 provides that such expenses expressly *do not* include "extraordinary expenses, depreciation, ad valorem taxes, capital expenditures or expenditures relating to vehicles or other tangible personal property not permanently used in the production of natural gas or oil." However, there is no indication that gathering, compression, processing, or transporting expenses fall within any of these excluded categories.

This "gap" or ambiguity therefore implicates the second stage of the *Chevron* analysis: "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court." Syl. Pt. 4, in part, *Appalachian Power,* 195 W. Va. 573, 466 S.E.2d 424. The Tax Department and Antero each make compelling arguments for whether such expenses

should be included in the operating expense calculation.[19]  Unfortunately, despite the prevalence of such operations in the State, the Legislature has not seen fit to address these expenses in the taxation scheme.  This uncertainty alone constrains our ability to resolve the issue on the relative merits of the parties' positions.  As the *Appalachian Power* Court aptly stated:

> Our power to review the Tax Commissioner's decisions on policy grounds is extremely limited. We are not at liberty to affirm or overturn the Commissioner's regulation or decision merely on the basis of our agreement or disagreement with his policy implications, even when important issues of taxation are at stake.

195 W. Va. at 588, 466 S.E.2d at 439.  Rather, "an agency's interpretation will stand unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Id.* at 589, 466 S.E.2d at 440 (quoting *Chevron*, 467 U.S. at 844).

With these limitations, we cannot say that the Tax Department's position that gathering, compressing, processing, and transporting expenses are not "directly related" to the "maintenance and production" of natural gas is arbitrary, capricious, or manifestly contrary to the enabling taxation statute.  In accordance with our precedent, its position "must be sustained if it falls within the range of permissible construction."  *W. Va. Health Care Cost Review Auth.*, 196 W. Va. at 339, 472 S.E.2d at 424.  More importantly, the

---

[19] *Cf. Appalachian Power*, 195 W. Va. at 591, 466 S.E.2d at 442 ("Both constructions are consistent with the statute's language. It is here that the *Chevron* analysis strikes its most telling blow to the plaintiffs. Under *Chevron*, we may not impose our own construction of the statute.").

equity of such an interpretation is well beyond the reach of this Court under these circumstances.[20] It is sufficient to conclude that the Tax Department's exclusion of these expenses from its average expense calculation is a reasonable construction of the regulation and not facially inconsistent with the enabling statute. Whether this Court would construe the regulation similarly is frankly beside the point:

> Our job is not to weigh the wisdom of, nor to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by an agency in interpreting and applying a statute. Moreover, it is not necessary for us to find that the regulation is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in this Court.

*Id.* at 339, 472 S.E.2d at 424. We therefore find that the business court's conclusion that such expenses must necessarily be included in the Tax Department's average operating expense calculation to be erroneous.

The foregoing notwithstanding, however, we find that our disagreement with the business court's conclusion is of little practical consequence to the case at bar. While the business court concluded that the survey improperly excluded gathering, compressing,

---

[20] In contrast, the Court was under no such constraints when analyzing whether royalty payments pursuant to an oil or gas lease governed by West Virginia Code § 22-6-8(e) may be subject to pro-rata deduction or allocation of reasonable post-production expenses in *Leggett v. EQT Prod. Co*., 239 W. Va. 264, 800 S.E.2d 850, *cert. denied*, 138 S. Ct. 472, 199 L. Ed. 2d 358 (2017). In that case, the Court was tasked with interpreting the "at the wellhead" language contained within that statute in conjunction with our canons of statutory construction to resolve private parties' dispute over royalties owed. The analysis employed in that case, despite the general similarity of the issue, is therefore inapplicable.

processing, and transporting expenses, thereby causing the average operating expense calculation to be under-inclusive, it failed to grant any relief in that regard. As previously indicated, in overturning the Tax Department's valuations, the business court imposed an unlimited operating expense of 30% for conventional wells and 20% for horizontal Marcellus wells, despite the fact that *these figures were derived from the survey it found inadequate*. Antero did not cross-assign this failure as error and does not squarely address this incongruity in its briefs;[21] furthermore, it requests this Court to affirm the business court's valuation. The Tax Department makes note of it, but simply argues this underscores the fallacious logic of the business court. In any event, this leads us to an examination of the relief crafted by the business court to resolve the gas well valuations.

## C.    THE BUSINESS COURT'S RELIEF

The Tax Department's final assignment of error contends that the business court failed to grant appropriate relief by removal of the cap and allowing an "unlimited" percentage expense deduction.[22] Relying on the principles articulated above from

---

[21] Antero's lone oblique reference to the application of the allegedly erroneous 20% figure states that it "eliminates *some* Constitutional infirmities, and is a reasonable approximation of 'true and actual value' until the Tax Department reevaluate its application of the Rule." (emphasis added).

[22] The Tax Department supplements its attack on the business court's remedy by arguing in a separate assignment of error that it erred by creating a "hybrid rule" for taxation in violation of this Court's opinion in *Lee Trace, LLC v. Raynes*, 232 W. Va. 183, 751 S.E.2d 703 (2013). Respondent counters that there is nothing "hybrid" about removal of the cap, and therefore *Lee Trace* adds nothing to the analysis. We agree.

27

*Appalachian Power*, the Tax Department argues that it has discretion in the manner in which it expresses the average operating expense and that the business court has usurped that discretion by fashioning its own methodology. In response, respondents insist that the business court merely removed the offending and inequality-creating aspect of the Tax Department's methodology, *i.e.* the cap, leaving the residual percentage operating expense deduction.

More specifically, the Tax Department—seemingly in contradiction to its argument that it properly utilized both a percentage *and* cap—insists that the business court erred by utilizing and/or permitting the use of a percentage to deduct operating expenses because the Rule requires an "average," stating: "The average of a bunch of numbers is a number."[23] Doddridge County, whose interests are unquestionably aligned with the Tax Department, expressly concedes in its brief that the language of the regulation contemplates the use of a monetary average across the board: "The Average Annual Industry Operating

---

*Lee Trace* involved the assessor's use of *both* the cost *and* income approaches to valuation, i.e. a "hybrid" valuation. The Court found that using the income approach in the particular circumstances in that case did not allow the assessor to comply with other provisions of the regulations regarding application of a capitalization rate. The business court employed no "hybrid" valuation method in its relief; therefore, *Lee Trace* is wholly inapposite. In fact, as set forth in our discussion *supra*, if there is a "hybrid" valuation method implicated at all, it is the one utilized by the Tax Department by using both a percentage and a monetary average cap to calculate the operating expense deduction.

[23] If so, this merely begs the question as to why the Tax Department utilized a percentage in the first instance.

Expenses is a fixed dollar amount, in this case, $5,000. Expenses are expressed as numbers. The average of a set of numbers is a number and not a percentage."

The question presented, then, is whether the business court erred in ordering the percentage average to be used, rather than the monetary average as a uniform deduction, or whether it should have deferred the issue of which formulation to use to the Tax Department altogether. In ordering the use of a percentage, unimpeded by the cap, the business court determined that a percentage average creates greater proportionality and avoids the issue of some wells having zero value, *i.e.*, a well where the gross receipts less the monetary average deduction nets zero value. It therefore ordered that the percentage average be utilized without any cap or maximum deduction.

We find that neither West Virginia Code of State Rules § 110-1J-4.1 nor § 110-1J-4.3 provide for a "sliding scale" or pro rata operating expense deduction. In that regard, there is as little authority for the Tax Department's use of a percentage expression of the operating expense deduction as there is for a "cap" of those expenses. The language of the Rule provides that "[t]he average annual industry operating expenses shall be deducted from working interest gross receipts . . . ." W. Va. C.S.R. § 110-1J-4.3. Our most well-worn canon of construction mandates that the Court is to give words "their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syl. Pt. 4, in part, *State v. Gen. Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959). With respect to the Tax

29

Department's purported discretion to express the average expense in the manner it deems fit, we are reminded yet again that "we are obligated to defer to an agency's view only when there is a statutory gap or ambiguity." *W. Va. Health Care Cost Review Auth.,* 196 W. Va. at 337, 472 S.E.2d at 422. Accordingly, we find that this clear, simply-stated regulation under any common-sense reading plainly contemplates use of a monetary average, which must be applied evenly across the board to avoid an unconstitutionally impermissible application. We therefore hold that the provisions contained in West Virginia Code of State Rules §§ 110-1J-4.1 and 110-1J-4.3 for a deduction of the average annual industry operating expense requires the use of a singular monetary average deduction.

As such, we conclude that the business court's relief erroneously required use of a percentage, rather than a monetary average operating expense deduction and reverse to that extent. However, "this Court does not have the authority to fix the assessment of appellant's property . . . [rather,] the trial court is invested by statute with such authority and the case [should] be remanded for that purpose." *In re Tax Assessments Against Pocahontas Land Corp.*, 158 W. Va. 229, 240, 210 S.E.2d 641, 649 (1974); *see also Matter of U. S. Steel Corp.*, 165 W. Va. 373, 379, 268 S.E.2d 128, 132 (1980) ("This Court does not have the authority to fix assessments because such authority is vested by

statute in the circuit courts."). Consequently, we remand to the business court for entry of an order consistent with this opinion.[24]

## IV. CONCLUSION

For the reasons stated above, the January 17, 2018 and February 7, 2018, orders of the business court in the above-styled matters are therefore affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this opinion.

Affirmed in part, and reversed in part, and remanded.

---

[24] In view of the Court's resolution of this matter, we find that Doddridge County's lone separate appellate issue—whether it was unfairly denied an opportunity to fully brief the issues below—has been rendered moot.